IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SHERRY A. JOHNSON, | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-1009 |
| | ) | Judge David S. Cercone |
| | ) | Magistrate Judge Lisa P. Lenihan |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
|     Defendant. | ) | |

REPORT AND RECOMMENDATION

I.   Recommendation

It is respectfully recommended that the Plaintiff's Motion for Summary Judgment (Docket No. 6) be denied, that the Defendant's Motion for Summary Judgment (Docket No. 8) be granted, and that the decision of the Commissioner of Social Security to deny Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Social Security Act (the "Act")[1] be affirmed.

II.   Report

Presently before the Court for disposition are cross motions for summary judgment.

---

1. See 42 U.S.C. §§ 401-433.

     A.  Procedural History

On July 22, 2005, Sherry A. Johnson timely filed a complaint pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), for review of the Commissioner's final decision disallowing her claim for DIB under Sections 216(i) and 223 of the Social Security Act, as amended, 42 U.S.C. §§ 416(i) and 423.  The history of the Plaintiff's claim is as follows:

Plaintiff protectively filed a claim for Social Security disability benefits on October 8, 2002, alleging that she had become disabled on June 1, 2001.[2]  Her claim initially was denied on March 27, 2003, after which Plaintiff filed a request for a hearing before an Administrative Law Judge ("ALJ") on May 20, 2003.  See R. at 32, 36.  Benefits were denied by the ALJ on April 22, 2005.  See R. at 9-17 (Decision of the ALJ).  The ALJ concluded that, while Plaintiff experienced pain and swelling in her right ankle, she still retained the residual capacity to perform available work.  See R. at 14-17.  The Appeals Council denied Plaintiff's request for reconsideration on May 27, 2005.  See R. at 4-6.

Plaintiff raises two issues before this Court, claiming: (1) the ALJ failed to give proper weight to the office notes and treating source opinions of Plaintiff's treating physician when determining Plaintiff's residual work capacity; and (2) the ALJ's decision was not supported by substantial evidence because it failed to grant proper weight to the testimony of the Vocational Expert, and was predicated on a defective hypothetical.  See Plaintiff's Brief in Support of Motion for Summary Judgment at 6-7.

---

2. To obtain disability insurance benefits, Plaintiff must show that she became disabled prior to her last date insured.  See R. at 52 (stating that Plaintiff had met this requirement).

B. <u>Statement of Facts</u>

Plaintiff was born on April 28, 1969, and was thus 35 years of age at the time of her hearing before the ALJ.[3]  <u>See</u> R. at 49, 212.  She completed high school and attended college for a period of time, but did not finish.  <u>See</u> R. at 216.  Prior to filing for DIB, Plaintiff worked as a waitress from August 1985 to June 1991, and as a billing clerk for a gas company from June 1991 to June 2000.[4]  <u>See</u> R. at 52-59; 219-220.  After suffering from pain and swelling in her right ankle for a period of time, she was diagnosed with avascular necrosis[5] of the talus[6] on March 22, 2001.  <u>See</u> R. at 74, 144.  Plaintiff alleges that this condition has rendered her unable to work since June 1, 2001.  <u>See</u> R. at 74, 217.

The record indicates that Plaintiff first began experiencing periodic pain in her right ankle in 1998.  <u>See</u> R. at 146.  On February 22, 2001, a CT scan of that ankle indicated a fracture of the talus with both vertical and transverse components.  <u>See</u> R. at 123.  Upon review of this scan, John Kirchner, M.D., an orthopaedic surgeon, prescribed the use of a non-weight-bearing cast for four weeks, with plans to follow up in order to rule out avascular necrosis.  <u>See</u> R. at 145-48. MRIs of Plaintiff's right ankle were performed on March 22, March 27 and September 7, 2001,

---

3. Plaintiff is therefore to be evaluated as a "younger individual" under the regulations.  <u>See</u> 20 C.F.R. §§ 404.1563, 416.963.

4. Plaintiff was laid off from her last position due to a merger.  She did not work the following year, but instead received severance pay and unemployment benefits during that time.  <u>See</u> R. at 74.

5. Avascular necrosis is the death of bone cause by deficient blood supply, and is often the precursor to osteoarthritis.  <u>See, e.g.</u>, <u>Barnes & Noble Concise Medical Dictionary</u>, 44 (Barnes & Noble Books 1995).

6. The talus is the second largest bone in the ankle, and is situated between the tibia and the calcaneus.  <u>See, e.g.</u>, <u>id.</u> 400 .

and March 4 2002, a comparison of which showed results consistent with avascular necrosis of the talus. See R. at 130-36, 149-52. Dr. Kirchner confirmed this diagnosis on March 11, 2002. See R. at 140, 143. It was recommended by Dr. Kirchner that Plaintiff wear a weight-bearing brace on her ankle.[7] See R. at 144. He also began research into revascularization procedures. See R. at 140.

Dr. Kirchner continued treating Plaintiff until August 2002. See R. at 139. During this time period he noted that she suffered from mild pain, swelling, and some atrophy. See R. at 140-41. He also noted that her talus had not collapsed and that her condition was remaining stable. See R. at 139-40. Plaintiff was referred to Carl Hasselman, M.D., for future treatment. See id.

The date of Dr. Hasselman's first examination of Plaintiff was March 3, 2003, at which time he noted that her ankle jerk reflexes were within normal limits, coordination tests showed normal rapid alternating movements, and there was no significant atrophy in her foot. See R. at 211 (office note from Plaintiff's first visit with Dr. Hasselman). Furthermore, Plaintiff's foot possessed normal tone, her extremities were not significantly malaligned, and she retained sensation. See id. While her ankle was tender and she had crepitus with her range of motion, x-rays showed no evidence of collapse of the talus. See id. Dr. Hasselman decided at that time to take another MRI with gadolinium, and to discuss the options of revascularization, fusion surgery and nonoperative treatment with Plaintiff. See id,

---

7. Dr. Kirchner also prescribed pain medication to Plaintiff on at least one occasion. See R. at 142 (referencing a prescription for Vioxx dated August 13, 2001). This prescription was written after he began treating Plaintiff as having avascular necrosis, see R. at 143, but before he explicitly stated that condition had been medically established, see R. at 140. Plaintiff testified that she was taking Ultram and Piroxicam for her pain and swelling at the time of her administrative hearing. See R. at 100, 218.

Dr. Hasselman's notes from his next examination of Plaintiff on April 3, 2003 revealed that her MRI indicated signs of early collapse. At that time he prescribed an Arizona brace and glucoseamine/chondrotin sulfate.[8] See R. at 209.

During his examination of Plaintiff on May 15, 2003, Dr. Hasselman noted that she was suffering from severe swelling. See R. at 208. He recommended the use of a compression stocking and, "more importantly," advised that she should elevate her leg above her heart for at least four hours a day, opining that this would help her "tremendously" and that it would be the only way that she could control her swelling. See id. (emphasis added). He also advised that she continue using the weight-bearing brace, because he had "a bad feeling that eventually she would collapse". See id. (emphasis added).

Plaintiff's next visit with Dr. Hasselman was November 13, 2003, at which time he noted that she suffered from more pain and swelling in her ankle. See R. at 207. However, he opined that there was little that he could do to alleviate Plaintiff's discomfort at that time, given that she was approximately six months pregnant.[9] See id. He recommended that she use a cane "for

---

8. This is described by Plaintiff as something "natural, to help with [her] ankle." See R. at 218-19. Counsel for the Commissioner describes glucosamine/chondroitin as "a dietary supplement." See Defendant's Brief in Support of Her Motion for Summary Judgment at 5.

9. The record does not indicate the date that Plaintiff's pregnancy began, but only states that she was *about* six months pregnant on November 13, 2003, which would place the beginning of the pregnancy sometime around the middle of May of that year. See R. at 207 (emphasis added). However, the record does indicate that Dr. Hasselman knew nothing of Plaintiff's pregnancy until June 19. See R. at 208. Thus, the assertion by Defendant that Dr. Hasselman prescribed leg elevation and the use of compression stockings only for the duration of Plaintiff's pregnancy is without support in the record. See Defendant's Brief in Support of Her Motion for Summary Judgment at 9-10.

now" in order to make her more comfortable.[10]  See id.  At Plaintiff's following examination on June 10, 2004, Dr. Hasselman noted that her latest x-ray showed a crack through the avascular talus involving the dome, and recommended another MRI with gadolinium in order to determine whether any revascularization had taken place.  See R. at 206.   The doctor notes his intent to discuss what sort of treatment would be best for Plaintiff, depending on what the newer MRI showed.  See id.

The notes from the examination on June 24, 2004, which is the final examination of Plaintiff by Dr. Hasselman in the record, show that her latest MRI indicated some neovascularization of her talus, and that there was no longer any evidence of collapse.  See R. at 205.  Dr. Hasselman prescribed the continued use of the brace and Mobic, with the intent of seeing whether a future MRI would show more neovascularization before determining whether a new course of treatment (such as surgery) were necessary.  See id.

In the interim between her final examination by Dr. Kirchner and her first examination by Dr. Hasselman, Plaintiff filed for DIB.  On February 28, 2003, she was examined by Shelana Gibbs-McElvy, M.D., for an orthopaedic consult examination.  See R. at 193-202.

Dr. Gibbs-McElvy concurred with Dr. Kirchner that Plaintiff suffered from right avascular necrosis of the talus and showed signs of decreased sensation in her right foot.  See R. at 194. Dr. Gibbs-McElvy further observed that (1) when wearing a right ankle and foot brace, Plaintiff was able to walk with a normal base of support and gait pattern without the use of a cane; (2) Plaintiff showed no signs of atrophy in any of her muscles; (3) Plaintiff's strength was +5/5 in all

---

10.  Plaintiff testified at her administrative hearing that she continues to use a cane.  See R. at 223.

her extremities;[11] (4) Plaintiff's deep tendon reflexes were +2/4 in the bilateral biceps, triceps, patellar and Achilles tendon;[12] (5) Plaintiff's plantar reflexes were down-going bilaterally; and (6) Plaintiff retained full range of motion in all of her joints. See R. at 194 (report of Dr. Gibbs-McElvy). Furthermore, Dr. Gibbs-McElvy noted that Plaintiff showed no evidence of talar dome collapse. See R. at 193.

Based on this examination, Dr. Gibbs-McElvy determined that Plaintiff was capable of performing work with the following limitations: (1) she would be able to lift, carry, push and pull ten pounds frequently and twenty pounds occasionally; (2) she would be limited to one hour of standing and walking in a cumulative eight-hour day, and limited to eight hours of sitting with alternating sit or standing at her option; and (3) she would be able to bend, kneel and stoop occasionally, but never crouch, climb or balance. See R. at 194-95.

Plaintiff asserts that she has done no work since the onset of her alleged disability.[13] See R. at 217-18. However, Plaintiff has stated that she continues to engage in a variety of activities, such as, *inter alia*, periodically visiting her in-laws and friends, see R. at 97, driving her children to school, see R. at 221, shopping for groceries two to four times a month, see R. at 221, attending church, see R. at 221, and going to the movies several times a year, see R. at 95. Plaintiff also testified at her administrative hearing that she was married with three children, aged twelve, eight and one. See R. at 216

---

11. Defendant characterizes this result as normal. See Defendant's Brief in Support of Her Motion for Summary Judgment at 7.

12. Defendant contends that this result indicates that Plaintiff has normal reflexes in these areas. See Defendant's Brief in Support of Her Motion for Summary Judgment at 7.

13. The ALJ found that Plaintiff indeed had not engaged in any substantial gainful activity since the date of onset. See R. at 14.

The ALJ found that Plaintiff retained a residual functional capacity which allowed her to perform sedentary[14] work with the following restrictions: (1) she could not lift or carry more than ten pounds occasionally; (2) she could not push or pull with her lower extremities; (3) she could only occasionally walk, climb, balance, squat, crawl, or kneel; (4) she could not be exposed to extreme cold; (4) she must be able to sit or stand at her own discretion; and (5) she must be able to use a cane for ambulation.  See R. at 14.

Finally, when asked by the ALJ whether jobs exist in the national economy for someone with the restrictions described above, the Vocational Expert present at Plaintiff's administrative hearing, Charles M. Cohen, Ph.D., testified in the affirmative.[15]  See R. at 16, 229-230.  In response to this, Plaintiff's counsel's proposed two hypotheticals, one involving the above restrictions but added the required use of a cane for balance in the dominant hand, and the other involving the ALJ's restrictions, but adding the necessity of resting with one's legs elevated above the waist for one hour in the morning and one hour in the afternoon, in addition to normal work breaks.  See R. at 230-31.  Dr. Cohen testified that work did not exist in the national economy for someone whose restrictions were described in these hypotheticals.  See id.

### C. "Substantial Evidence" Standard of Review

---

14. Sedentary work is defined as work that "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  See 20 CFR §§ 404.1567(a), 416.967(a).

15. Dr. Cohen specifically gave the examples of a stuffer, (listed under the Dictionary of Occupational Titles as number 731.685-014), a lamp-shade assembler (739.684-094) and a dowel inspector (669.687-014). See R. at 230. None of these jobs are listed as requiring the ability to climb, balance or crouch.

In reviewing an administrative determination of the Commissioner, the question before any court is whether there is substantial evidence in the agency record to support the findings of the Commissioner that the plaintiff failed to sustain her burden of demonstrating that she was disabled within the meaning of the Social Security Act. 42 U.S.C. § 405(g).  See also, e.g., Richardson v. Perales, 402 U.S. 389 (1971); Adorno v. Shalala, 40 F.3d 43 (3d Cir. 1994).

More specifically, 42 U.S.C. Section 405(g) provides:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.  The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .

Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1000) (citing Pierce v. Underwood, 487 U.S. 552, 565 (1988)); Plummer v. Apfel, 186 F.3d 422 (3d Cir. 1999).  Although there may be contradictory evidence in the record, it is not cause for remand or reversal of the Commissioner's decision if substantial support exists.  Sykes v. Apfel, 228 F.3d 259, 262 (3d Cir. 2000).  If substantial evidence supports the Commissioner's decision, the Court must affirm it.

D.  Disability Evaluation

The issue before the Court for immediate resolution is a determination of whether there is substantial evidence to support the findings of the Commissioner that Plaintiff was not disabled within the meaning of the Act, but had the residual capacity to perform a form of substantial gainful employment.

The term "disability" is defined in 42 U.S.C. Section 423(d)(1)(A) as:

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . .

The requirements for a disability determination are provided in 42 U.S.C. Section 423(d)(2)(A):

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence . . . 'work which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

A "physical or mental impairment" is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. Section 423(d)(3).

Finally, the applicable regulations set forth a more explicit five-step evaluation to determine disability.  The regulations, published at 20 C.F.R. §§ 404.1501-1529, set forth an orderly and logical sequential process for evaluating all disability claims.[16]  In this sequence, the ALJ must first decide whether the plaintiff is engaging in substantial gainful activity.  If not, then the severity of the plaintiff's impairment must be considered.  If the impairment is severe, then it must be determined whether she meets or equals the "Listings of Impairments" in Appendix 1 of the Regulations which the Commissioner has deemed of sufficient severity to establish disability.

---

16. This evaluation process has been repeatedly reiterated with approval by the United States Supreme Court.  See, e.g., Barnhart v. Thomas, 124 S.Ct. 376, 379-80 (2003).

If the impairment does not meet or equal the Listings, then it must be ascertained whether she can do her past relevant work. If not, then the residual functional capacity of the plaintiff must be ascertained, considering all the medical evidence in the file. [17] The finding of the ALJ that Plaintiff is unable to perform her past relevant work satisfied Plaintiff's burden[18] and the burden then shifted to the Commissioner to show that other work exists in significant numbers in the national economy that accommodates her residual functional capacity. See 20 CFR § 404.1520; Green v. Schweiker, 749 F.2d 1066, 1071 (3d Cir. 1984).[19] Thus, it must be determined whether or not there is substantial evidence in the record to support the ALJ's conclusion that Plaintiff remained capable of engaging in substantial gainful activity available to her. See 42 U.S.C. § 423 (d)(1)(A).

    E.  Analysis

**(1) Evidence of Dr. Hasselman**

Plaintiff asserts that the ALJ erred by disregarding or failing to assign substantial weight to the reports and notes of Dr. Hasselman. See Plaintiff's Brief in Support of Motion for Summary Judgment at 7. Plaintiff specifically references Dr. Hasselman's reports dated May 15, 2003 and

---

17. The finding of residual functional capacity is the key to the remainder of findings under the regulations. If the plaintiff's impairment is exertional only, (i.e. one which limits the strength she can exert in engaging in work activity), and if her impairment enables her to do sustained work of a sedentary, light or medium nature, and the findings of age, education and work experience, made by the ALJ coincide precisely with one of the rules set forth in Appendix 2 to the regulations, an appropriate finding is made. If the facts of the specific case do not coincide with the parameters of one of the rules, or if the plaintiff has mixed exertional and non-exertional impairments, then the rules in Appendix 2 are used as guidelines in assisting the ALJ to properly weigh all relevant medical and vocational facts.

18. See Record at 16 ("The claimant us unable to perform her past relevant work.").

19. The Commissioner may establish that jobs for a particular claimant exist in the national economy in several ways, including by way of the testimony of a vocational expert. See Jesurum v. Secretary of th U.S. Dept. of Heath and Human Services, 48 F.3d 114, 119 (3d Cir. 1995).

June, 2004, in which the Plaintiff was advised to elevate her legs above her heart for four hours a day, and to use a cane. See R. at 205-09; see also Plaintiff's Brief in Support of Summary Judgment at 7. Plaintiff further claims that the ALJ improperly relied on the report of Dr. Gibbs-McElvy, which concluded that Plaintiff was capable of work within certain restrictions, to the exclusion of contradictory evidence in the notes of her treating physician, Dr. Hasselman.[20] See R. at 193-200; see also discussion, Part II.B., supra.

Plaintiff correctly notes that a treating physician's evidence is entitled to controlling weight. See Podedworny v. Harris, 745 F.2d 210, 216 (3d. Cir. 1984). Furthermore, a finding of residual function capacity that conflicts with a treating physician's opinion and "is made without analytical comment or record reference is not supported by substantial evidence." See Rossi v. Califano, 602 F.2d 55, 57-58 (3d Cir. 1979). However, this does not require the ALJ to delve into the minutia of what was rejected and why, but merely to provide "an expression of evidence she considered would support the result, [and] *some* indication of the evidence which was rejected." See Williams v. Apfel, 98 F. Supp. 2d 625, 631 (3d Cir. 2000) (emphasis added).

In the case at bar, the ALJ specifically reviewed Dr. Hasselman's findings, making mention of the Plaintiff's use of a brace and the doctor's recommendation of a cane in November,

---

20. Plaintiff asserts that the notes of Dr. Gibbs-McElvy are internally inconsistent, claiming that in them, the doctor concluded that Plaintiff could work for eight hours a day with a sit/stand option, but was "limited to no more than one hour or less of standing or walking in a cumulative eight hour day". See Plaintiff's Motion in Support of Summary Judgment at 7; see also R. at 195. Plaintiff's specific issue with this report is that, in her view, it is untenable to exercise a discretionary sit/stand option throughout an eight-hour workday while being limited to only one hour of standing. See Plaintiff's Motion in Support of Summary Judgment at 7. However, this is a mischaracterization of Dr. Gibbs-McElvy's report. A correct reading of the doctor's opinion is that Plaintiff cannot be required as part of her duties at any potential job to stand and walk for more than an hour cumulatively in an eight-hour day. This limitation is separate and distinct from Plaintiff's exercise of discretion in determining whether to sit or stand at her workstation. See R. at 195. Thus, it was rational for the ALJ to rely on this report to determine that Plaintiff was limited to sedentary work. See R. at 15, 229.

2003.  See R. at 15, 205-11.  The ALJ further made note that Dr. Hasselman noticed stability in Plaintiff's ankle, a lack of muscular atrophy, and that the fracture in Plaintiff's talus had healed.  See R. at 15.  Finally, the ALJ considered Dr. Hasselman's notation of evidence of collapse of Plaintiff's talus, and provided later statements by the doctor that the talus had not collapsed, and indeed there was evidence of some neovascularization.[21]  See R. at 15, 205.

      Regarding Plaintiff's first issue, it is true that the ALJ made no mention in her opinion of Dr. Hasselman's May 15, 2003 recommendation that Plaintiff elevate her legs for four hours a day.  See R. at 205; see also discussion, Part II.B, supra.  However, in more than a year of treatment subsequent to his recommendation of leg elevation, Dr. Hasselman never again mentioned the need for it.  Even in his latest note, dated June 24, 2004, Dr. Hasselman did not make any references to leg elevation at all, even though he explicitly stated a treatment plan which included the continuation of using a brace and taking the drug Mobic.  See R. at 205.  This lack of medical evidence in the record calls into question whether leg elevation was still recommended at the time of Plaintiff's administrative hearing; thus, it was within the ALJ's discretion not to consider it when determining Plaintiff's residual function capacity.[22]

      As to the issue of the cane, Dr. Hasselman's November 13, 2003 note is the only time that he mentioned that Plaintiff should use one, and even then he failed to clarify whether it was

---

21. Neovascularization, or revascularization, is defined as the regrowth of blood vessels to tissue that is has been denied normal blood supply.  See, e.g., Barnes & Noble Concise Medical Dictionary, 361.  This indicates some healing of Plaintiff's condition, and is treated as such by the ALJ in her opinion.  See R. at 15, 205.

22. If more objective medical evidence had existed, including, e.g., physician notes reflecting the implementation of, helpfulness of, or continuing prescription of, leg elevation, the same might then give this Court reason to remand this case for further proceedings.  However, no such evidence is present.

necessary simply as an aid for ambulation, or to provide balance and/or bear weight while Plaintiff was standing.  See R. at 207.  Because Plaintiff failed to provide sufficient medical evidence on the subject, it was not unreasonable for the ALJ to conclude that the cane was needed only for ambulation, especially given the evidence of healing in Plaintiff's right ankle in subsequent reports made by Dr. Hasselman, which was referenced by the ALJ in her decision.  See R. at 15, 17, 205.

Dr. Hasselman made no explicit statements in his notes in the record that described or limited Plaintiff's residual function capacity or that were inconsistent with Dr. Gibbs-McElvy's findings.  Furthermore, his notes showed objective evidence of stability and healing in Plaintiff's ankle, and his most recent evidence contradicted earlier signs of collapse, as was addressed by the ALJ.  Thus, it is the conclusion of this Court that the ALJ's determination of Plaintiff's residual function capacity encompassed a fair review of the record as a whole and was based on substantial evidence.

**(2) Vocational Hypothetical**

Plaintiff also asserts that the ALJ erred in relying on a hypothetical posed to the Vocational Expert that did not fully reflect Plaintiff's limitations.  See Plaintiff's Motion in Support of Summary Judgment at 9.  Plaintiff claims that, since the ALJ's hypothetical did not include a need for Plaintiff to use a cane in her dominant hand while standing, in order to bear weight,[23] and/or  Plaintiff's need to elevate her leg for one hour in the morning, and one hour in the afternoon, in addition to normal work breaks, the ALJ's hypothetical was deficient.  See

---

23. While Plaintiff characterizes her cane as necessary for weigh-bearing purposes, see Plaintiff's Brief in Support of Summary Judgment at 9, the questions posed by her counsel to the Vocational Expert at her administrative hearing described the cane as being used to aid in balance.  See R. at 230.

Rosario v. Shalala, 836 F.Supp 257, 262 (E.D. Pa. 1993), citing Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1984) (stating that "a hypothetical question that does not reflect all of a claimant's impairments is improper, and any response thereto cannot be considered substantial evidence").

Because the record shows that the ALJ used substantial evidence in her determination of Plaintiff's residual functional capacity, it need only be determined whether the hypothetical that she posed to the vocational expert matched that determination. A comparison of the ALJ's finding of Plaintiff's residual functional capacity and the ALJ's question to the vocational expert show that they are the same. See R. at 15, 229. Furthermore, the hypothetical described Plaintiff's limitations with specificity.[24] Because in this case the hypothetical (1) reflected an assessment of Plaintiff's work-related limitations supported by substantial evidence, and (2) fairly described those limitations with sufficient specificity, the questions were not defective and the Vocational Expert's answers were properly considered.

III. Conclusion

For the reasons discussed above, it appears that the ALJ's conclusion is supported by substantial evidence. It further appears that the ALJ did not fail to proffer to the Vocational Expert a hypothetical accurately encompassing Plaintiff's specific work-related limitations. For these reasons, it is recommended that Plaintiff's Motion for Summary Judgment be denied, that Defendant's Motion for Summary Judgment be granted, and that the decision of the Commissioner

---

24. See also Podedworny, 745 F.2d 210 (3d Cir. 1984) (explaining that the characterization of claimant's physical condition must consider specific impairments, and hypothetical must accurately portray all impairments that could seriously affect claimant's ability to engage in alternate employment).

be affirmed.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrates, within ten (10) days after being served with a copy, any party may serve and file written objections to this Report and Recommendation.  Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.

        Respectfully submitted,

        /s/ Lisa Pupo Lenihan

        LISA PUPO LENIHAN,
        United States Magistrate Judge

Dated: August 3, 2006

cc:  Honorable David S. Cercone
     United States District Judge

     Charles T. Pankow, Esq.
     955 Liberty Avenue.
     Pittsburgh, PA  15222

     Megan Farrell, Esq.
     United States Attorney's Office
     700 Grant Street, Suite 4000
     Pittsburgh, PA  15219